**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

PATRICIA S. FLESHMAN, :

                Plaintiff,

  -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                Defendant. :

Case No. 3:11-cv-125

District Judge Thomas M. Rose
Magistrate Judge Michael R. Merz

**REPORT AND RECOMMENDATIONS**

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986).  Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury.

*Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment

or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSD on December 4, 2006, alleging disability from November 20, 2002, due to chronic body pain and depression. *See* PageID 139–41,154. The Commissioner denied Plaintiff's application initially and on reconsideration. *See* PageID 90-92, 94-96, 101-06. Administrative Law Judge Amelia G. Lombardo held a hearing, (PageID 64-81), and subsequently determined that Plaintiff is not disabled. (PageID 42-56). The Appeals Council denied Plaintiff's request for review, (PageID 31-36), and Judge Lombardo's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Lombardo found that she met the insured status requirements of the Act through December 31, 2009. (PageID 44, ¶ 1). Judge Lombardo also found that Plaintiff has severe chronic obstructive pulmonary disease, polymyalgia rheumatica and fibromyalgia, but she does not have an impairment or combination of impairments that meets or equals the Listings. *Id.*, ¶ 3, PageID 47, ¶ 4. Judge Lombardo found further that

Plaintiff has the residual functional capacity to perform the full range of medium work. (PageID 48, ¶ 5). Judge Lombardo then used sections 203.15 and 203.22 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and found there is a significant number of jobs in the economy that Plaintiff is capable of performing. (PageID 55-56, ¶ 6). Judge Lombardo concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (PageID 56, ¶ 7).

The record contains a copy of treating physician Dr. Kallet's office notes dated November, 2000, to February 2008. (PageID 431-55; 593-94; 655; 670; 708). Those notes reveal that in March 2004, a bone density study indicated the presence of osteopenia of the lumbar spine and left hip and a February 2007 chest CT scan revealed small foci of interstitial lung disease, suggestive of chronic changes. *Id.* Those notes also reveal that on August 29, 2008, Dr. Kallet reported that Plaintiff had been evaluated and treated for muscle pain/weakness, weight loss, depression, and shortness of breath and that she had seen various specialists and diagnosed with polymyalgia rheumatica, fibromyalgia, and emphysema. *Id.* Dr. Kallet opined that Plaintiff was incapable of full-time gainful employment. *Id.*

Plaintiff treated with chiropractor Derek Black from October 2002 through July 2004. (PageID 458-74). In January 2003, an x-ray of Plaintiff's cervical spine revealed mild degenerative disc disease, facet arthrosis, and a malpositioning of T2-T4. *Id.* In March 2007, Derek Black reported that Plaintiff was unable to use her extremities for functional tasks due to weakness. (PageID 457).

Plaintiff began receiving treatment from neurologist Dr. Vandersluis on November 18, 2002. (PageID 259-60). He noted that Plaintiff reported problems with intermittent weakness

4

in her legs with difficulty on stairs, numbness in her groin and thigh, which was exacerbated by sitting, and some numbness in her hands, which also felt weak. *Id.* Dr. Vandersluis also noted that examination demonstrated no abnormalities. *Id.* Subsequently, laboratory tests revealed an elevated sedimentation rate, (PageID 262), MRI's of Plaintiff's lumbar spine, cervical spine, and brain were negative, (PageID 263-64), an EMG nerve conduction study of Plaintiff's lower extremities was without definitive evidence of neuropathy, plexopathy, radiculopathy, or myopathy, (PageID 258), and an EMG nerve conduction study of Plaintiff's upper extremities was consistent with left median mononeuropathy with minimal evidence of chronic denervation and no evidence of radiculopathy, plexopathy, or myopathy. (PageID 255). In addition, an EEG was normal, (PageID 257), and a carotid ultrasound was within normal limits. (PageID 256).

Plaintiff sought emergency room treatment on November 22, 2002, for complaints of weakness in her arms and legs with intermittent numbness and tingling. (PageID 242-53). The health care provider noted that Plaintiff reported that her symptoms had been "off and on" for approximately two months but had worsened, she had an increased number of falls, which she attributed to her leg and arm weakness, she was not taking any medication, and that she smoked one pack of cigarettes per day. *Id.* It was also noted that Plaintiff had normal ranges of motion, an intact neurologic examination, 5/5 strength in each of her four extremities, and intact, 2+ and equal deep tendon reflexes in her upper and lower extremities. *Id.* A CT scan of Plaintiff's head was negative. *Id.* Plaintiff's diagnoses was identified as paresthesias and weakness of extremities and she was discharged with advice to follow-up with Dr. Vandersluis. *Id.*

In January, 2003, Dr. Vandersluis noted that Plaintiff complained of increased pain in her upper extremities, tremors, weakness and occasional numbness. (PageID 254). Dr.

Vandersluis also noted that on examination, Plaintiff had normal cranial nerves, a slight tremor to outstretched arms, symmetrical grip strength, a relatively narrow-based gait, and that her reflexes were sustained and somewhat prominent in the lower extremity. *Id.* Dr. Vandersluis noted further that an x-ray of Plaintiff's cervical spine suggested mild degenerative disease. *Id.* On January 23, 2003, Dr. Vandersluis noted that Plaintiff's examination was unremarkable and that he was unable to identify a structural source for her pathology. (PageID 267).

The record contains a partial treatment note from the Dayton Heart Center dated July 8, 2002, and March 3, 2003. (PageID 239-40). Those notes reveal that Plaintiff reported no symptoms of shortness of breath, that she was on steroids for fibromyalgia or fibromyositis without much improvement, and that her atypical chest pain related to her myositis. *Id.* The notes also reveal that Plaintiff denied having any functional limitations although she said she was unable to walk because of severe muscular weakness, she acknowledged she continued to smoke, and that on physical examination, Plaintiff had facial puffiness, probably secondary to steroid use. *Id.*

The record contains a copy of treating rheumatologist/immunologist Dr. Ranginwala's office notes dated February 2003 through February 2007. (PageID 476-513). On April 21, 2003, Dr. Ranginwala reported that Plaintiff complained of weakness in her arms and legs and significant achiness, that she was unable to get our of a chair without help, examination failed to reveal any active synovitis of the joints, she had weakness of the deltoid, biceps, and hip flexors with 5-/5 bilaterally, and that her reflexes were symmetrical and 2+ bilaterally. *Id.* Dr. Ranginwala also reported that Plaintiff had undergone extensive neurological work-ups which failed to reveal any evidence of an underlying neurologic problem as the cause of her muscle weakness. *Id.* Dr. Ranginwala noted that Plaintiff's condition was consistent with a diagnosis of polymyalgia

rheumatica. *Id.*

Over time, Dr. Ranginwala treated Plaintiff with medications and in October 2003 reported that her pain was mostly myofascial in nature. *Id.* On March 15, 2004, Dr. Ranginwala reported that Plaintiff did not have any active synovitis of the joints and had multiple tender points in the trapezii, suboccipital area, and upper back, and he opined that Plaintiff's pain was myofascial in origin. *Id.* Dr. Ranginwala continued to prescribe medications and also recommended Plaintiff participate in physical therapy which she did for seven sessions. *Id.*; see PageID 278-93.

Plaintiff underwent a muscle biopsy in March 2003 which revealed changes consistent with mild denervation atrophy. (PageID 276-77).

The record contains a copy of treatment records from rheumatologist Dr. Henderson dated May 1, 2006 through September 18, 2009. (PageID 515-24, 606-11, 646-51, 657-59, 712-14). When Dr. Henderson first evaluated Plaintiff in May 2006 he noted that she had a history of weakness of her arms and legs since about 2003, had been treated with medications, had lost about thirty pounds over the past year without dieting, and has had myalgias and arthralgias which had been persistent. *Id.* Dr. Henderson also noted that Plaintiff had a few tender points, no significant synovitis, and some minor degenerative changes in the hands, and that his impression was fibromyalgia syndrome and history of polymyalgia rheumatica. *Id.* Over time, Dr. Henderson continued to note that Plaintiff had tender points. *Id.*

Dr. Henderson reported on August 23, 2007, that he first saw Plaintiff on May 1, 2006, she had diffuse musculoskeletal pain, clinical evidence of rheumatoid arthritis, numbness of her hands, and diffuse weakness, and had an unsteady gait. *Id.* On April 15, 2008, Dr. Henderson noted that Plaintiff was developing Dupuytren's contracture of the fourth and fifth digits on the right

7

hand, had a ganglion cyst of the left wrist, and that she had 11/18 tender points. *Id.* Dr. Henderson also reported that Plaintiff was able to alternate sitting, standing, and walking for a total of one hour in an eight-hour day, was able to climb stairs occasionally, was not able to lift any weight, and was not able to sustain work on a full time basis. *Id.* Dr. Henderson reported further that Plaintiff was limited in her ability to use her hands for simple grasping or fine manipulation, needed complete freedom to rest during the day, and that she would likely miss work up to five days a month. *Id.* Dr. Henderson continued to periodically treat Plaintiff for her polymyalgia rheumatica and fibromyalgia through 2009, and he noted that Plaintiff's examination findings were unchanged and her condition was stable. *Id.*

Plaintiff received treatment from Dr. Shah, a hematology/oncology specialist during August-November, 2006, for complaints of general aches and pains, weight loss, and abnormal immunoglobulin levels. (PageID 372-81). Dr. Shah's office notes reveal that Plaintiff underwent a bone marrow biopsy which was negative for any myeloma or Waldenströms macroglobulinemia. *Id.* Dr. Shah continued to monitor Plaintiff at six-month intervals through 2009, during which time he identified Plaintiff's diagnosis as reactive hypergammaglobulinemia. (PageID 623-45, 652-53, 660-69, 688-91, 706-07). On May 29, 2008, Dr. Shah opined that Plaintiff was capable of performing full-time sedentary work, but that Plaintiff's rheumatologist should address that issue. *Id.*

Dr. Rubio, a pulmonologist, began treating Plaintiff in February 2007 and reported that Plaintiff had some scattered rhonchi in her lungs and a prolongation in the expiratory phase of respiration. (PageID 598-602). Dr. Rubio recommended that Plaintiff stop smoking. *Id.* A pulmonary function study performed on March 12, 2007, revealed mild obstructive pulmonary

disease with a reduced lung diffusion capacity. *Id.*

Examining psychologist Dr. Flexman noted in March 2007 that Plaintiff was married and lived with her spouse, had a tenth grade education, denied having had psychiatric hospitalizations or any current mental health treatment, reported that her emotional state as "good, frustrated and down on occasion", and that her appetite was variable. (PageID 529-32). Dr. Flexman also noted that Plaintiff reported that her activities included socializing with family and friends, driving, preparing food, doing household chores, gardening, shopping, boating, playing cards, using the computer, going to the park and to a cabin, watching television, babysitting her grandchildren, attending her grandchildren's activities, reading, and handling her own finances. *Id.* Dr. Flexman reported that Plaintiff was alert and oriented, described her mood as "nervous", had an appropriate affect, no evidence of receptive difficulties, was able to understand instructions, could recall six digits forward and five digits in reverse, and that she had a good attention span, good concentration and recent memory, fair judgment, and average intellectual functioning. *Id.* Dr. Flexman also reported that Plaintiff's reliability was good and suggested no malingering, her obsessive thinking concerning somatic or other psychological problems was out of proportion with reality, and that somatization was present. *Id.* Dr. Flexman identified Plaintiff's diagnoses as undifferentiated somatoform disorder and depression NOS, and he assigned her a GAF of 65. *Id.* Dr. Flexman opined that Plaintiff's abilities to understand, remember and carry out short, simple instructions and to make judgments for simple work-related decisions were normal, she would have slight difficulties with sustained attention and concentration, interaction with others, and that she would have moderate restrictions in responding appropriately to work pressures and to changes in a normal work setting. *Id.*

On May 14, 2007, examining physician Dr. Danopulos essentially reported that Plaintiff's examination was normal. (PageID 572-82). Dr. Danopulos reported further that Plaintiff's complaints included polymyalgia rheumatica, fibromyalgia, effort-related shortness of breath and depression, and that she smoked over one pack of cigarettes a day but had been trying to quit and now only smoked five cigarettes a day. *Id.* Dr. Danopulos noted that objective findings were consistent with a diagnosis of polymyalgia rheumatica with fibromyalgia without any physical or neurologic changes and with normal grip strength, mild to moderate emphysema, and depression. *Id.* Dr. Danopulos concluded that Plaintiff's ability to do any work-related activities was affected in a negative way by her impairments. *Id.*

A bone density study performed on October 14, 2009, was compatible with osteoporosis, "placing the patient in a high fracture risk category." (PageID 697). A chest x-ray performed in November, 2009, revealed a stable appearing chest with no acute disease. PageID 693. A pulmonary function study performed in December, 2009, indicated moderate obstructive pulmonary disease. (PageID 702-05). On December 27, 2009, Dr. Rubio reported that Plaintiff was limited to performing sedentary work. (PageID 694).

Plaintiff alleges in her Statement of Errors that the Commissioner erred by failing to find that she has a severe mental impairment and by failing to properly weigh the opinion of treating physician Dr. Henderson. (Doc. 9).

Plaintiff argues in support of her first Error that the Commissioner erred by failing to find that she suffers from a severe mental impairment. Plaintiff's position is that three psychologists commented on her mental problems, but Judge Lombardo did not cite to any psychological opinions to support her finding thereby substituting her own lay opinion for that of

10

the medical experts.

An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience. *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 90 (6th Cir. 1985)(citation omitted); *see also, Bowen v. Yuckert,* 482 U.S. 137 (1987).

An ALJ does not commit reversible error in finding a non-severe impairment where the ALJ determines that a claimant has at least one other severe impairment and then goes on with the remaining steps in the disability evaluation, since the ALJ considers all impairments, including non-severe impairments, in determining residual functional capacity to perform work activities. *See, Maziarz v. Secretary of Health and Human Services,* 837 F.2d 240, 244 (6th Cir. 1987).

Contrary to Plaintiff's contention, substantial evidence supports Judge Lombardo's determination that Plaintiff does not have a severe mental impairment. First, as noted above, Judge Lombardo determined that Plaintiff had at least one medically determinable severe impairment. (Page ID 44). Second, Judge Lombardo considered Dr. Flexman's and the reviewing psychologists' opinions in reaching her conclusion. (PageID 46). In addition, Judge Lombardo correctly recognized that certain factors undermined Plaintiff's allegations that she suffered from a severe mental impairment. For example, Dr. Flexman reported that Plaintiff's abilities to understand, remember, and carry out short and simple instructions, and to make simple work-related decisions were normal. (PageID 532). Dr. Flexman also reported that Plaintiff had only slight impairment in her abilities to sustain attention and concentration and to interact with others. *Id.* Further, Judge Lombardo found that although Dr. Flexman reported that Plaintiff had moderate difficulty in the

11

ability to respond appropriately to work pressures and changes, Dr. Flexman assigned Plaintiff a GAF of 65, which indicates, at worst, mild difficulties in functioning.[1] (PageID 46, 531). Judge Lombardo also found that Plaintiff's self-reported activities supported a conclusion that she does not have a severe mental impairment. *Id.* In addition, the record reveals that Plaintiff never sought any mental health treatment beyond receiving psychotropic medication from her family physician. Judge Lombardo noted that throughout the record, health care experts described Plaintiff's mental status as normal. (PageID 259, 374, 574, 639). Judge Lombardo then proceeded past step two of the disability evaluation process before she determined at the fourth step that Plaintiff is not disabled. Accordingly, Judge Lombardo did not commit reversible error by failing to find that Plaintiff has a severe mental impairment. *Maziarz, supra.*

Plaintiff argues in support of her second Error that the Commissioner failed to properly consider Dr. Henderson's opinion. Specifically, Plaintiff contends that Judge Lombardo failed to discuss the correct standard for assessing Plaintiff's fibromyalgia.

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009). "One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> these sources are likely to be the medical professionals most able to
> provide a detailed, longitudinal picture of [the claimant's] medical

---

[1] While a GAF, standing alone, may not be dispositive of disability or nondisability, it is a factor that the Commissioner may consider and weigh with other evidence. See *Kornecky v. Commissioner Social Security*, 167 Fed. Appx. 496, 503 n. 7 (6th Cir. Feb.9, 2006) ("A GAF score may help an ALJ assess mental RFC, but it is not raw medical data."); see also, 20 C.F.R. § 404.1520

>impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,* 20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406*, quoting, Wilson,* 378 F.3d at 544*.* "On the other hand, a Social Security Ruling[2] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,*582 F.3d at 406*, citing, Wilson,* 378 F.3d at 544*, citing* 20 C.F.R. § 404.1527(d)(2).

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R.

---

[2] Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

13

§404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07,*citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Blakley,* 581 F.3d at 407*, citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

In rejecting Dr. Henderson's opinion that Plaintiff could not perform the physical demands of sedentary work on a full time basis, Judge Lombardo essentially found that it was not supported by objective signs and findings and was inconsistent with the other evidence. (PageID 53). Although Dr. Henderson opined on April 15, 2008, that Plaintiff was unable to sit, stand, or walk for any length of time, but could alternate positions for a total of one hour in an eight-hour workday,

14

could not lift five pounds, was unable to use her hands, and could never use her feet or legs for repetitive movements, his clinical findings do not support that opinion. For example, as the Commissioner notes, Dr. Henderson reported that Plaintiff had few tender points, minor degenerative changes in the hands, her condition was stable and unchanged, and that she had no particular problems. (PageID 518, 608-09). Additionally, as Judge Lombardo found, Dr. Henderson's assessment was more restrictive than Plaintiff's own statements as to her activities. Further, Judge Lombardo noted and the record establishes, that Plaintiff did not start to receive treatment from Dr. Henderson until May 2006 almost 4 years after her alleged onset date. (PageID 53). Moreover, Dr. Henderson's opinion is not supported by the objective test results which reveal, at worst, mild abnormal findings. Finally, Dr. Henderson's opinion as to Plaintiff's extremely limited residual functional capacity is inconsistent not only with Plaintiff's own statements but also with Dr. Danopulos' findings and opinion as well as with the reviewing physicians' opinions. (PageID 564, 572-82, 583-92, 619). Under these facts, the Commissioner had an adequate basis for rejecting Dr. Henderson's opinion as to Plaintiff's residual functional capacity.

The Sixth Circuit has recognized that fibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 243, (6th Cir. 2007), citing *Preston v. Secretary of Health & Human Services,* 854 F.2d 815, 820 (6th Cir. 1988)(per curiam). Fibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion. *Rogers, supra.* The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials. *Id.* (citation omitted).

15

While it is true that fibromyalgia can be a severe impairment that cannot necessarily be confirmed by objective testing, the mere presence of a diagnosis alone is never conclusive evidence of disability.  See *Young v. Secretary of Department of Health and Human Services,* 925 F.2d 146 (6th Cir. 1990).  The mere diagnosis of an impairment does not indicate the severity of the condition nor the limitations, if any, that it imposes.  *Id.*  In the present case, the evidence of record discussed *supra* simply does not support Plaintiff's allegation of total disability.  Plaintiff's activities alone belie her claim.  In addition, the medical evidence, including Dr. Henderson's treatment notes, Plaintiff's other treating physicians' notes, and the reviewing physicians' opinions support the Commissioner's finding that Plaintiff is not disabled.

The Court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence.  *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982).  The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."  *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939).  The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

February 24, 2012                                                                                      s/ **Michael R. Merz**
                                                                                                                 United States Magistrate Judge

16

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).